Case number 24-7022. Nicole Pileggi, individually and on behalf of other similarly situated appellants versus Washington Newspaper Publishing Company, LLC. Mr. Hammock for the appellant, Ms. Konopczynski for the affiliate. Good morning. Good morning, Your Honours. And may it please the court, I'm Joshua Hammock on behalf of Nicole Pileggi. I'd like to reserve two minutes for rebuttal. This appeal concerns what it means to be a consumer under the Video Privacy Protection Act. The statute defines consumer as, quote, any renter, purchaser, or subscriber of goods or services from a videotaped service provider, unquote. But the district court required those goods or services to be audiovisual in nature. Effectively, it inserted the term video or audiovisual into that statutory text. As this court is no doubt aware, the Second Circuit recently resolved this exact issue, and it disagreed with the district court's approach. Addressing the meaning of goods or services, it concluded, quote, the VPPA's text, structure, and purpose compel the conclusion that the phrase is not limited to audiovisual goods or services, unquote. And the case overruled the very precedents from the Southern District of New York that the district court here relied on to reach its decision. The Second Circuit got it right. What we're really talking about here is the VPPA's one-sentence liability clause. We're not talking about what it means to be a consumer in the abstract. We're talking about consumer as that term is used in the VPPA's liability provision, a single sentence alongside two other separately defined terms, videotape service provider and personally identifiable information. And it's important to keep in mind that the act requires all three elements together, VTSP, consumer, and PII. Let's start with videotape service provider, which the statute defines as any person, quote, engaged in the business of rental, sale, or delivery of prerecorded videocassette tapes or similar audiovisual materials, unquote. Think Blockbuster, the quintessential example of a videotape service provider, a brick-and-mortar store engaged in the business of renting out VHS copies of movies. I'm going to think about newspapers because that's what this case is about, if that's okay. And my question is, how does the statute work under your definition? So if I pay the Washington Examiner to post a wedding announcement, and I obviously have to give them contact information, things like that, I pay for the wedding announcement. Now every time I go on their website, they have to make sure the megapixels don't follow me? Well, not necessarily. What they have to make sure they're doing is not disclosing your personally identifiable information, which is not just... I am now a purchaser. I fall within the... Correct. Oh, I agree you're a consumer in that scenario. Yes, I agree. And if I'm a consumer and I go on their website, they can't track me. I mean, that's your whole case, is that a consumer here went on the website and they were tracking for information. I don't think that's... Video watching information. I don't think that's the whole case because the important thing, first of all, personally identifiable information recall has to connect the user to specific video materials or services. I'll go on website and I watch videos. And then the VTSP has to disclose that information without informed consent. Well, again, it's the same. I don't understand how this is different from your case, except she bought a newsletter. I'm buying a notice about a wedding. Right. We're in the same position. I agree that you both are consumers in that scenario. We're both consumers and the issue here was that Pileggi goes on the website and watches videos. And when she's there, they nab her video watching information, maybe some other PII and send it off to Meta. Right. The disclosure is the violation. I understand that. And so I've bought a wedding announcement. Right. And then the next afternoon I go on the website to watch some videos and they snatch my information, automatically collected, I guess is my thing, and send it off to Meta. That would be a violation in your view. Yes. Okay. I would subject the Washington Examiner to a minimum of $2,500 per person. Correct. And they have 100,000 subscribers. Give or take. Sure. Yeah. Yeah. So let's say $25 million. Oh, I don't know. I was told there would be no math, Your Honor. You're very confident that your client is a consumer, but one of the things you leave out in that equation, it seems to me, or at least don't stress, is whether the Washington Examiner is a videotape service provider. And there's a reason for that. The district court below assumed that the Washington Examiner was a VTSP without resolving that question, basically deemed it wasn't material. I understand that. But your argument with respect to that question says, well, it stresses the video part of that videotape service provider, right? And so if the Washington Examiner or anything is putting out videos on their website, then they qualify as a videotape service provider. Well, I think they have to be in the business of providing those videos. But yes. What happened to the word tape? It seems to me that that's just as important as maybe even more important functionally than the video part of it. It's an object. It's a physical object. If it's a tape, I can see the argument that a DVD is the equivalent. But I don't see any physical item here that's being provided. And let me just round this off with two other thoughts, and you can respond, okay? It does also seem to me that what we have here is a statute that technological developments has rendered obsolete. And Congress really hasn't attended to it. There's arguments by constitutional lawyers about the living constitution. I don't see why the statute ought to be a living statute for the judiciary to try to adjust it to technology that has rendered it obsolete. Well, so two points, Your Honor. I think the definition of VTSP is really the only place where you find the kind of physicality requirement. But it also includes kind of a catch-all at the end of that definition. Or similar audiovisual material. That doesn't answer the question. Similar to what? Similar to tapes? Tapes are physical objects. So to be similar to a tape, it has to be a physical object. Well, I don't think any court has held that it has to be similar in terms of physicality. I think it has to be similar in terms of delivering video. What I care about is the precedent in this court. And we have no precedent dealing with that question. I think that's probably right. But it's also a question, Your Honor, that the district court didn't resolve. So I think if you want to reach out and resolve VTSP status, that's really something for the district court to decide in the first instance, not this court to resolve. Yeah, but I'm not willing to accept, without knowing that, I'm not willing to accept your advocacy that it's clear that your client was a consumer. I don't know that unless I know what the definition of videotape service provider is. Well, again, that's exactly what the district court assumed here, right? Assuming that they are a VTSP, do we meet consumer status? And the district court said no. That determination was wrong. The answer should have been yes. That's exactly what Salazar holds. So the answer should be yes. Now, Roman, back to the district court. Salazar didn't deal with the question I'm talking about, the tape. It actually did. At least, maybe not directly, but it has language that sheds light on that exact question. It didn't analyze. No, that's not true. It did, in fact, analyze it because it said entities that, as some part of their business, deliver video content, even if it's a relatively small part of their business. It's not just Blockbuster. It's other companies, too. It didn't analyze the meaning of tape. Oh, I guess that's true, Your Honor. They didn't focus in on the meaning of tape, particularly. That much is true. I wanted to get back to my hypothetical. How is this supposed to work? How is the Washington Examiner supposed to know which people who previously took out an ad, placed a notice in the newspaper, bought a keychain from their gift store, are the ones that are now on the web? Well, I mean... How are they supposed to... I don't understand how they're supposed to... I don't understand how this works. There are a couple of ways for them to deal with that problem. One is to track consumers. They have a list of information about their consumers, and they know if they're sharing that information with other people. That would be one way to do it. Another way to do it... It doesn't automatically take the information. This metapixel process gathers the information. Washington Examiner looks at it and says, okay, we'll release this one, but not that one. Oh, I understand. You're saying on these specific facts, they couldn't do that because pixel is operating behind the scenes automatically. That much is true. That was my hypothetical, which I think is identical to your case. Oh, absolutely. I bought a wedding announcement instead of a subscription. Absolutely. I agree now. But my point was... I mean, the reading... Sorry, just to spell out the thought here. I apologize. The reading that there's no nexus requirement between the purchase of a good and the watching of videos becomes inadministrable. It requires any video service provider who's sold anything to anybody to not gather information full stop because they've got no capacity to determine which of the people on its website within the last year bought a product from them. I don't think it's an administrable, Your Honor. And I think it's true that they couldn't do it automatically the way the pixel does now. They would have to have some administrative step to determine whether that individual is a consumer. But another way out would be to... Does the technology allow that? I don't know the answer of whether the existing technology allows that. It might require some innovation. Or it might just not permit this particular use of the technology that violates consumers' privacy rights. But there's also, of course, informed consent. There's no way to differentiate who's on my website, whether they're a consumer, whether they're a purchaser, renter, subscriber, bought anything from us. Then they just can't. They have to just not collect it at all for their own purposes, let alone for META. I don't think that's right. I don't think there's any reason they couldn't collect it for their own purposes because, again, disclosure is the thing prohibited. You have to have a disclosure of PII. Would it have to be disclosure to a third person or can it be a disclosure to another part of Washington Examiner Company? I'm not sure that I've ever seen a case that involves that question either. But no, I think it has to be to a person who is not the person who is the VTSP, in other words. I don't know what that means when you've got something like a newspaper that has lots of written news content and has some video content. Probably has different people managing the video content than writing the news stories. There's an editorial board over here. If they disclose the information within the entire entity, is that a disclosure? I don't think so, no, Your Honor. It has to be someone outside the company, not outside the video service provision portions of the company. Correct. I think that's right because a VTSP is a VTSP as a unit. Washington Examiner as a whole is a VTSP, not just this one branch of Washington Examiner is a VTSP. So in other words, look entity-wide and the disclosure has to be outside of that entity to a third party who is a person under the statute. Okay, and it says that that's how you're reading the word disclosure. Correct, yes. So if you're right, if no nexus is required, what this statute does is simply forbid all sales by any entity that shows maybe a single video on its website to third parties. I don't think it does that, Your Honor, and there are a couple of reasons. It just would because there's no way to know when someone then comes to watch the video if they were the whatever it is you want to talk about. They have no way of knowing that and there's no way of differentiating that, and so it's essentially a strict liability statute. If we do it for anybody, we have a risk of sweeping in one person who bought something from us. I don't think that's right, and again, there are a couple of touch points. In this iteration of the example, you said that there's just one video on the website. Well, I'm not sure that just one video in collection in comparison to all the other things that you do on the website, news and other stuff, would make you be in the business of delivering video content the way that would be required for a VTSP. So it's starting to sound like maybe the example here has slipped away. What percentage of what the Washington Examiner does is word news versus video? I don't know the percentage. Well, it seems like you have to just say it depends on how much you do. No, well, I'm saying it depends on whether you're in the business of delivering. You said the business depends on volume. You didn't like the one video situation. I don't think that one video necessarily would be enough to make you be in the business of delivering videos. I don't have a threshold in mind, but if that's your test, I don't have any sense of, I confess to not having been on the Washington Examiner website, and so I don't have any sense of what the percentiles are. If it were 5% video, is that in the business? I don't know how you would even measure it in a context like this where every article has a video accompanying it. Every article has a video? I believe that's the allegation that these videos basically appear at the top of every article and they autoplay. You have to turn it off to stop it from playing. Are these videos about the news or are these advertisement videos? They can be both. They can start with an advertisement and run into something that's related to the article. Okay, so now these website companies can't have ads on their websites either because there's a risk that some consumer might come onto their website. Why couldn't they have advertisements? If they're playing, all the ads I see on websites are automatically playing as you say, and if someone who's a consumer goes on, unless they're not collecting any information, I assume the reason people want to be on theirs. The reason someone wants to advertise on your website is they've gotten this information about somebody and knows that these people on this website might be interested in this product. Well, I think that's exactly right. I don't know how the advertising system works if they can't provide information about who comes to their website to the people they're asking to advertise on their website. It would work precisely by obtaining informed consent from the consumers whose information you're sharing. That's the only step. But you don't, again, unless you have a firewall that says the only people who can come on to our website to allow this statutory informed consent form, you're not going to have a normal website that anybody comes to, right? People will not, no one will be able to access it because you can't know if that person, there's always a risk that any one of those people will have purchased, rented, or subscribed to something. Well, hold on, I guess I'm sure I'm following now because I think that the differentiator would be whether that individual, consumer or not, provided informed consent. Basically checked, yes, I'm okay with you sharing my data. Is that all they have to do? I thought your argument, because they argue that that's what Ms. Pelleggi did here and you said, no, no, no, no, there's this, I mean, I know the district court didn't decide this yet, but that, no, there's a statutorily required consent form. That's true. In this case, there is. Does it have to be the statutorily required consent form or is just a check yes consent form? Well, no, it has to be the statutorily required. Well, that's more than check yes, isn't it? No, it just has to be separately set out that we are going to share your information, your video PII with third parties, check yes, and if the consumer or the non-consumer checks yes, then share the information, and if not, don't share the information. That's simple enough. But they're going to have to have, that's going to have to be sort of the wall before anyone gets to their website. Everyone will have to check that box coming in every time they come in. Right, just like any other terms of use box appears on lots of other websites. Yes. No, usually it does when you're signing up for a service. I've never checked one of those boxes going on to it. Well, that's a fine point. You could sign up, you could do it on as an entry point into signing up for a service, a separate consent form that sets forth, we're going to share your PII as defined by the statute with third parties. Are you okay with it? Yes, no. The argument you're making is based on the idea that a subscriber does not have to be a subscriber of audiovisual service. Is that correct? That is absolutely correct. Yes, that's the way Congress wrote the statute. Right, but that's not the way you argued the case in the district court. I disagree with that, and this brings up the waiver argument, but I disagree with that wholeheartedly. And if you look at our brief, which is ECF 22 below, our brief opposed to the motion to dismiss, section C of that brief concerned Ms. Pelleggi's status as a consumer. Part C1 had the heading, quote, plaintiff's newsletter subscription makes her a subscriber and thus a consumer protected by the VPPA, unquote. That's the exact argument Washington Examiner now claims that we didn't make. There's a whole section of our brief devoted to that precise point, and on page 19 in that section, near the end of that section, Ms. Pelleggi specifically argues, quote, as in Yershov, plaintiff has plausibly pled that because she gave Washington Examiner her personal information and signed up for a newsletter subscription, she is a consumer under the VPPA, unquote. So there was no waiver here. This is the exact same argument we made below. There was a second argument under part C devoted to basically even if those SDNY courts were right, and it needs to be some audiovisual material, just so happens that the newsletter would meet that requirement too. But that's an argument in the alternative. It wasn't the only argument we made, and it certainly wasn't a concession that go ahead and rewrite the statute to require audiovisual materials in terms of consumer status as opposed to PII. It seemed to me you were arguing a different point with respect to consumer, and it also seems to me that the district court was well acquainted with what you were arguing, and the district court said the plaintiff did not dispute to be a subscriber of the VPN subscribing to audiovisual services and not goods or services writ large. Well, so the district court did say those words, and it looked at part C-2, that alternative argument when it said we made that concession. It ignored part C-1, which is where we said she's a subscriber to a newsletter and thus a consumer under the VPPA. That's the exact same argument we made here in our making now. That's the exact same argument that the Second Circuit credited and that we think resolves this appeal. On the issue of whether one has to be a purchaser to be a subscriber, isn't it relevant that in the heading of the statute as it appeared in the public law publication and it's the same heading as in, you know, you look at the statute on Westlaw or, you know, U.S. Code for Section 2710, it says wrongful disclosure of videotaped rental or sale records. So, the Supreme Court has told us, and we have cases in the Bar Court telling us that you can look at those headings to help, you know, interpret the language in the statute. So, doesn't that support the argument that you've got to be a purchaser where Congress put the heading of the whole thing? It's videotaped rental or sale records because it doesn't rental or sale necessarily comport with purchasing. And so, therefore, subscriber is somebody who rents for purchases by subscription as opposed to, like, on a one-time basis. Why isn't that the best reading of the statute? So, no, Your Honor, I don't think you can read the statute that way. And to get to the point where you're using a heading to interpret a provision and its meaning, you have to have some ambiguity, right? That's step one, find an ambiguity that we need to read the heading to help elucidate which permissible reading is the right one. We don't have an ambiguity here. We have renter, purchaser, subscriber. Those are three different things. Well, there's an ambiguity. I mean, this whole fight we're having here is about what the subscriber. You're saying that subscriber is an unambiguous term. I do think so. And I think there's another. There's some definitions that say the subscriber has to be a purchaser. And then there's some definitions that say, don't mention purchaser. So, why doesn't that make it ambiguous? Well, even if it were ambiguous, which, again, the district court didn't hold that. Washington Examiner never argued that precise point. But even if it were ambiguous, there's another canon that does the work before you jump to, well, let's look at just the heading and go with whatever the heading says. And that canon is you can't just read a term out of a statute. You don't read it as if Congress put in a term that has no meaning. It's just surplusage. And this reading, what you've done now or what you're suggesting here, would read subscriber right out of the statute. Every subscriber under that view would be a renter. The subscriber is, I mean, Netflix was completely changed again because, precisely because they created this whole subscription method of renting DVDs. It didn't mean that subscribing was the same as renting. It meant that it was a particular type of renting. Way back in the day, I'm old enough, old enough to be your grandpa, where I had a membership to Columbia Records. And you as a subscriber, you could get a new album or CD mailed to you every month or periodic. Didn't mean that subscription was the exact same thing as sale. It's just a different way of selling. Well, I think that's the problem though. You're basically saying a subcategory of a renter or a purchaser. So subscriber never does any work on its own. It has no independent meaning. It's just some subset of renters or some subset of purchasers. But why then would Congress put it into the statute at all if it has no independent meaning? It's doing no work. That's exactly what the Supreme Court has many times said not to do. Don't read terms out of the statute. Don't create surplusage where you can avoid it. And here you can avoid it by simply holding, well, of the two permissible meanings, assuming we have an ambiguity here, we have to adopt the one that gives some independent meaning to subscriber. And that means you don't have to pay money to have access to the service or the good at issue here. Doesn't it do some work in the sense that it's a serialized renting or sport or sale? You're just saying that that doesn't count because that's still just a subset of the other two items in the list. It sounds like the same exact principle, right? You're renting it for a longer period of time or you're purchasing it in a different way. But what you're still doing at bottom is either renting or purchasing that good or service. There isn't a third category that subscribing is touching that isn't one of those other two things, at least as I understood. How can the Washington examiner comply with 2710E of the statute? Under your theory. I'm not sure I follow. This is the destruction of old records one. Yeah. So, information that they had already collected as of 1988 had to be destroyed within a year. But how do they destroy it? Oh, goodness. I don't know how in 19... I assume there were paper records. This is even possible. That's my question. I don't know that. I don't know that.   It wasn't an issue at all in this case. There's something about the newsletter and there's allegations that it has hyperlinks in it.  And elsewhere, there's allegations that there are videos on the website that if you click on immediately start playing. Correct. Do the hyperlinks in the newsletter, if you click on those, they just immediately start playing? Or do they take you to the website and then you have to click on the little arrow or something to get it to play? I believe it's the former. They take you to basically the website or an article on the website, which includes a video that automatically starts playing. But there's no allegation about that actually in your complaint. I don't think there is an allegation that she clicked a newsletter link and that's how she accessed an article or a video. It automatically starts playing? Don't you have to click on the screen to get it to play? The triangle on the side? No, that's not the allegation contained in the complaint. The complaint says that the videos automatically start to play when you click the link or open the webpage. Is this advertising videos or actual material provided by Washington Examiner? Again, I don't want to draw too fine a line between those things because it might be one that runs into the other. It might be an advertisement that starts playing and is five seconds long or whatever, and then it runs into a video that's about the content. If I were to just go on the website, so not going through the newsletter, and you said there's things already automatically playing, are those only ads? I don't believe so. I think it's the same situation. Can they collect information from me if I'm just looking at the website or do I have to click on something? You mean, like, does the pixel work? I just, yeah, this metapixel thing, if I just go to the website and I'm just looking around on it, but I haven't clicked on anything, but things are running, they're not collecting any information on me. I think they could be collecting information on you, but I'm not entirely sure in that scenario if they are, in fact. Thank you. Any other questions? All right, so for all of those reasons, Your Honors, and those in our brief, we ask that you reverse the decision dismissing the complaint. We'll give you a couple minutes for rebuttal. May it please the Court, Grace Knopf-Chensky on behalf of the defendant, Apolli, the Washington Examiner. The Court should reject plaintiff's attempt to turn the narrow 1988 Video Privacy Protection Act into a broad internet privacy statute that would upend the modern internet. The act is fundamentally about protecting the privacy of purchasers, renters, and subscribers who request or obtain videos, not goods or services writ large. And as your questions indicated, Judge Millett, plaintiff's reading to extend to goods and services writ large, particularly without any knowledge, would make compliance with the statute almost impossible. I'd like to just give some of the facts from the amended complaint. The complaint alleges that the Washington Examiner- Why is compliance? I mean, you've got knowledge. You had an arrangement with someone, they bought something, you got information from them, and you know that you got Metapixel going on your website, so- But we have no, there are no allegations that there is knowledge when the disclosure occurs. That the Washington Examiner knew which visitors to its website were consumers within plaintiff's definition of consumer, and so it did not know that the information it was disclosing belonged to a consumer. It did know when a consumer came on the website? It did not know. I'm sorry if I misstated. Well, it has the information. No, Your Honor. It has, when Ms. Palegi visited the website, she was the same as any other individual who navigated to that website. What if she clicked on a link? I know there's not an allegation in the complaint, but if she clicked on a link in the newsletter? If she had clicked on a link in the newsletter, that might address our knowing requirement, because I- That would be a, would be knowing, but it also would be a nexus. The very product that she bought for this purpose of having information and things to look at, she clicked on the link, and that's what collected her information, because it automatically started playing. Or even without playing, maybe it collects her information. That would be a pretty tight nexus. I don't believe it satisfies the nexus if anyone else could navigate to that website without the link. They couldn't do it. I would agree. They couldn't do it. They'd have to go on the website, find the link, and then directly click on it. Whereas here, part of the newsletter is, we serve it to you on a silver platter. That's what you're giving her. Yes, but when you visit the website, she would be no differently situated than any other. You're making it very easy for her to get it organized and under topics. So that is, they're the good she has bought is, amongst other things, access to this video and ease of access to this video information. I think there is a difference there, Your Honor, but that's also not what she alleged. She alleged that the newsletter access was separate from… She could unremand allege. If an amended complaint could allege she or somebody else. No, I don't believe so, Your Honor, because this is actually already her amended complaint in response to our first motion. All right, it's a different case. If someone alleged… I'm trying to understand the nexus theories here. If someone… If I subscribe to the newsletter, which I assume you tout is specialized information, easy, nice packaging for you, and I click on the link that's been nicely packaged for me, nicely categorized. I don't know if you tailor these to their interests, but whatever. And I click on it, and immediately my information is collected. Because it, not me, takes me to the website, but all I know is a video is playing. There's a pretty tight nexus there. I think that there is a tighter nexus than in the allegations and the complaint. I don't think there… No, Your Honor, I think it's different if there was a paywall that existed such that the only way to access those videos was by clicking through the link in the email. Then I would agree with you, Your Honor, that that, assuming that she paid for the access to the newsletters to go to Judge Wilkins' questions, that would make her a subscriber to the videos that are only available on the website to people… If I subscribe to a newsletter that is described as providing me videos and presumably written information, I have not subscribed to the video information in that newsletter? You have not subscribed to the video information that is then allegedly disclosed by the Washington Examiner, which is the video information on the website. You don't subscribe to the disclosure of your PII. You subscribe to the video service. Yeah, it's subscribing to the videos that the Washington Examiner has then allegedly disclosed. But again, there were no allegations about that here, even in response to our making this argument in our first motion to dismiss. This is already an amended complaint that was responding to those arguments here. And then to go to Judge Wilkins' questions about subscriber, subscriber requires a payment. We pointed to multiple dictionary definitions from the time of enactment, which are the only dictionary definitions that are relevant to statutory interpretation here, all of which require a payment in order to be a subscriber. I thought I saw some that did not. I thought that there was a Webster's that third new international dictionary. It says subscribe is to enter one's name or publication as a book or newspaper or service. And there was no reference to payment. So I believe that Ellis cited a dictionary from 1981 that would probably be a contemporaneous dictionary, but the definitions that were provided in that dictionary either didn't have to do with goods and services. We don't dispute that John Hancock subscribed to the Declaration of Independence so that you can subscribe to a political party or a set of religious beliefs. But those definitions don't correspond to goods and services. The only definition there that kind of applied to goods and services was a subscriber of telephone equipment. Someone who subscribes to telephone equipment in the 1980s was clearly paying for the telephone company to put the equipment in their house or place of business. And it's not just the dictionary definitions, Your Honor. It's also the use of all four terms in conjunction with one another. If there's a dictionary definition that said define subscribe is to receive a periodical or service regularly on order. I think the on order connotes a payment there, Your Honor.  I think that's the most natural reading of the term, especially when you're looking at three sign up for the local newspapers. You don't pay for newsletters, newsletters. I mean, I think in the modern reading, yes, we sign up to and we are subscribers to newsletters all the time. They may not be as pervasive as they are now, but there were things you could sign up to and they would send you sort of a monthly mailing or twice a year or whatever it was. And I think the preponderance of the dictionary definitions all require the payment term. And particularly when you combine subscriber with renter and purchaser as the definition of consumer. The use of those four terms together. Statutory terms are known by the company in which they appear all require a payment and Congress. Not when one would then be would serve no purpose. No, Your Honor. I think that their subscriber is not rendered superfluous in that situation. If I have to pay for my subscription, am I purchasing something from the person who sends out the subscription? You a purchaser of video goods pays for permanent control of those video goods. A renter pays by the good for temporary control and a subscriber pays a set amount, typically in advance, whether or not they take any videos at all. It's a set monthly, typically recurring fee. So those are three different relationships.  I don't understand that at all. If I when you sign up for the newsletter. If there's a would you like our newsletter? It's a $5 a month charge, but you get discounted prices on the videos, right? So that's how it's supposed to make it worthwhile to you. Have I purchased something from the entity that is providing that newsletter? You are. Have I purchased something? Yes. You you could say that you had purchased a subscription, but I think then you're reading subscription back into the statutory terms. Sorry, am I a purchaser of that subscription? You could be a purchaser of the subscription. Yes, your honor. Is a subscription a good or service provided by the video service provider? A subscription could be a service provided by a video service provider. So I will have purchased when I sign up for this newsletter and give them my $5 so I can get discounted movie videos. I have purchased a good or service. I think you're going then to a level of abstraction where you would at all. You just said I've purchased it and it's a good or service. I see nothing abstract about that. I think that could actually render rental and goods also superfluous within the statute. Requiring purchases. If you don't require purchases, you don't require monetary payment. If you do pay, it could still be a subscription, but you don't require it. Then they all three have independent function. No, your honor. The definitions of subscriber from the time primarily required payment. They're all used as definitions of the term consumer, which also requires payment. Congress also enacted a referenced Cable Privacy Act. I have to pay to be a consumer? The definitions we point to, yes, your honor. They all reference payment from the time of enactment. Is there any evidence that any place in the United States that was a videotape company or whatever gave their tapes away? I'm not aware of any evidence that they were giving tapes away. I am aware of evidence that we cited in our brief of subscription services that existed at the time of the enactment where you paid a set fee per month for unlimited access to those videos. Excuse me, your honor. Like Netflix. A precursor to Netflix, your honor. When they were doing DVDs. Yes, this was this was still using VHS at that time. The questions, but. All right, so I see that I'm out of time with that. We would ask to affirm the district parts decision below. Thank you. Thank you, your honor. Hey, Mr. Hammocks, I said we'll give you 2 minutes. Thank you, your honors. Just really quickly. I want to talk about that nexus point 1 last time. And point out the fact that Congress wrote these 2 separate definitions in a 1 and a 3. Very different a 1's definition of consumer requires a narrow relationship, rent, purchase, or subscribe to broad content goods or services. A 3 does the exact opposite. It looks for a broad relationship request or obtain even a freestanding request counts here. To a very narrow set of content specific video materials or services. So there's just no way I'm sure that works. Because it's not goods or services period. From a video services of a video service provider. It is goods or services from a video service provider. And isn't the assumption that the good or service. That come from a video service provider are going to be. Video services. Absolutely not. And in fact, look at a 3, and it has that same formulation of from a video tape service provider. What that tells you is that it is possible for a video tape service provider to have both. Specific video materials and services and separately goods and service goods or services. 1 might be a subset of the other. A 3 is going to have a subset of what is in a 1. But they're not entirely the same. It's confirming what the from meant. I disagree, your honor. And again, that would mean that Congress use these different terms, different relationships to different content to mean the exact same thing. And that violates like the primary. The cardinal statutory interpretation from a video service provider as requiring a nexus. Well, if if from is the nexus in both provisions, which would be parallel. Then why would it have goods or services in a 1 and specific video materials or services in a 3? There'd be no reason if the nexus exists and from that's the type of personally identical information that they're including. That's it's member. It's an includes language there. And so they're specifying 1 particular thing, but we have to look at. What is the content that we're talking about here? Are we talking about any good or service? Or are we talking about a video? And if from is the thing that makes it a video from exists in both places, why would we need the video modifier in a 3, but not a 1? Suddenly the statute is under your interpretation is requiring all now audio visual service providers. To stop collecting. Yeah, I'm on who's looking at what are requesting what they'd have to, because there's no way otherwise. To protect yourself against someone who happened to also have bought something from you coming on. Yeah, I again, I disagree. You don't have to stop collecting it. You have to stop disclosing it without consent. That's the piece that you have to stop doing. Well, of course, that's the reason they collect. Even has a technology to collect it. They've got Facebook collecting it. Fine, I can accept that that point, but the problem isn't the collection. Websites in this country that have. That would qualify under your view as a video service provider. I don't whether it's newspaper. There's gotta be. Hundreds of thousands, probably a million. There are certainly a lot of it or uncommon. To collect information from users should come to the websites. I do not know. I don't know. I mean, certainly you've got something as ubiquitous as Facebook involved, so it's probably somewhat common, but I don't have a percentage that I can quote to you today. Your honor. But the point is a lot of work for 1980 statute about videotapes today. It might be that things have to change from their current form, but that isn't a reason to read out of the statute. The words that actually exist there. That's not a good reason to read out of to read out the actual terms. Congress enacted. We have to follow those words. That's the cardinal principle for statutory interpretation. So again, we ask that you reverse the decision. Thank you. Thank you very much to both counsel. The case is submitted.
judges: Millett; Wilkins; Randolph